U.S. District Court
District of Connecticut
FILED AT NEW HAVEN

August 30 , 20 23

By  S. Santos
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES FOR SEARCH
WARRANTS AUTHORIZING THE
INSTALLATION AND USE OF
TRACKING DEVICES ON VEHICLES

Case No.  3:23-mj-00769 (MEG)

**FILED UNDER SEAL**

## SUPPORTING AFFIDAVIT

I, Kyle C. Bowdy, a Special Agent of Homeland Security Investigations, being duly

sworn, deposes and says the following:

### REQUEST & INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to

conduct investigations and to make arrests for offenses enumerated in Title 18, United States

Code, Section 2516. I am also authorized to apply for search warrants pursuant to Federal Rule

of Criminal Procedure 41.

2.      I make this affidavit in support of applications for search warrants authorizing the

installation and use of a Global Positioning System (GPS)[1] mobile tracking device on three

vehicles (collectively referred to as the "**Target Vehicles**"), identified herein and in Attachment

A, incorporated, as follows:

---

1  GPS is a technology that substitutes for the earlier generation of proximity-detecting "bumper-beepers"
previously used by law enforcement. The prior generation of beacons functioned by transmitting a radio impulse that
a remote tracking device reads to determine the proximity of a beacon. In contrast, a GPS beacon functions by
emitting a signal that can be read by a satellite that then transmits the location information in a form that FBI's
computer system is able to calculate and project on a map. A GPS mobile tracking device falls within the meaning
of "tracking device" as that term is defined in 18 U.S.C. § 3117(b), that is, "an electronic or mechanical device
which permits the tracking of the movement of a person or object.

a.   A gold Ford Explorer with Connecticut license plate AW42925 (**Target Vehicle-1**"),[2] such license plate not belonging on **Target Vehicle-1** and not returning as registered to a vehicle or person. As described below, this vehicle is believed to be operated by Tommy FIGUEROA, a.k.a. "Coco" (FIGUEROA).

b.   A black Honda Civic with "El Flow De Tu Gata" in white letters on the windshield, bearing Connecticut license plate AX91675, registered to Silvia Torrez (**Target Vehicle-3**). The vehicle is believed to also be operated by FIGUEROA.

c.   A black Dodge pickup truck bearing Connecticut license plate BC27455 (**Target Vehicle-4**), such license plate not belonging to the vehicle. As described below, this vehicle is believed to be operated by Daniel DIAZ-RIVERA, a.k.a. "Lupito," a.k.a. "Lupin" (DIAZ-RIVERA)

3.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations enumerated in Title 18, United States Code, Section 2516, including: distribution of, and possession with the intent to distribute a controlled substance; conspiracy to do the same; and the use of communication facilities in furtherance of controlled substances offenses, all in violation of Title 21, United States Code, Sections 841, 846, and 843(b) (hereafter referred to as

---

2 On July 21, 2023, the Honorable U.S. Magistrate Judge Robert M. Spector authorized the installation of a GPS mobile tracking device on **Target Vehicle-1** and a red BMW X6 bearing New Jersey License plate 702417R (**Target Vehicle-2**). Investigators attempted to install the GPS mobile tracking device on **Target Vehicle-1** on July 26, 2023, and July 28, 2023, with negative results. On July 26, 2023, investigators were unable to located **Target Vehicle-1**. On July 28, 2023, investigators located **Target Vehicle-1**; however, it was parked in the area of a surveillance camera. As a result, investigators were unable to install the GPS mobile tracking device without the threat of detection and the search warrant was unexecuted.

the "Target Offenses") have been committed, are being committed, and will be committed by

FIGUEROA, the operator of the **Target Vehicle-1** and **Target Vehicle-3**, and DIAZ-RIVERA,

the operator of **Target Vehicle-4,** as well as known and unknown coconspirators. There is also

probable cause to believe that the location information of the **Target Vehicles** will constitute

evidence of the Target Offenses and will lead to the identification of individuals who are

engaged in the commission of the Target Offenses and the locations and times of their meetings.

4.     This court has authority to issue the warrants for the **Target Vehicles** under 18

U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

5.     I am a Special Agent with the United States Department of Homeland Security,

Homeland Security Investigations (HSI), and have been since June 2005. I have been assigned to

the HSI New Haven Field Office since December 2022. I am a graduate of the Criminal

Investigator Training Program and HSI Basic Training Program at the Federal Law Enforcement

Training Center in Glynco, Georgia. Prior to my employment with HSI, I served as a Federal Air

Marshal in the New York Field Office, and prior to that, I served as a United States Border Patrol

Agent in Nogales, Arizona. My current duties include the investigation of transnational gangs,

federal firearms and narcotics trafficking violations, money laundering, fraud, cyber intrusion,

and other crimes against the United States. My experience with HSI and previous employers

includes many felony investigations, covering a wide range of subjects including narcotics-

related crimes. I have arrested numerous individuals for violations of federal drug laws and have

participated in the execution of numerous search warrants resulting in the seizure of drugs, drug

proceeds, property, and firearms. I have also participated in the execution of numerous orders

authorizing the interception of wire and electronic communications, the subject of which were

the possession and sale of controlled substances.

6.    Additionally, I have interviewed and worked with numerous confidential informants, whose reliability and veracity have been verified through prior police investigations, and whose assistance has resulted in controlled purchases of drugs and the introduction of undercover police officers to persons who engage in the sale of drugs. I have attended several schools and seminars concerning the enforcement of the laws prohibiting the trafficking of narcotics and firearms, money laundering, and the packaging and concealment of narcotics/firearms and proceeds from narcotics/firearms sales. As a result of these experiences, I am familiar with the language, conduct, and customs of people engaged in conspiracies to violate the drug, firearm, and money laundering laws of the United States.

7.    The facts contained in this affidavit are based on my personal participation in the investigation, and information received from other law enforcement officers. I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit. The statements contained in this affidavit are based on: (1) my personal participation in the investigation; (2) information provided to me by members of law enforcement; and (3) my experience and training. This affidavit is only intended to establish probable cause for the requested warrants and does not set forth all my knowledge about this matter. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part.  Where I assert that an event took place on a particular date or time, I am asserting that it took place on or about the date or time alleged.

8.    As described below, the investigation is being conducted by the Waterbury Safe Streets Task Force, which is comprised of investigators from the Waterbury Police Department, HSI, and the Federal Bureau of Investigation (FBI) (hereafter "the Task Force"). Based on the investigation to date, there is probable cause to believe, and I do believe, that FIGUEROA is

involved in an illegal narcotics distribution operation that is believed to primarily sell cocaine base (crack) as well as fentanyl. The drug trafficking organization (DTO) involves multiple individuals, who operate all hours of the day and night, every day of the week. The focus of the distribution operation is based out of the Maple Avenue and Cherry Street area of Waterbury, Connecticut. Additionally, DIAZ-RIVERA is believed to be in a leadership role of the DTO.

## OVERVIEW OF CONFIDENTIAL SOURCES

9.      The Task Force has received information from several cooperating sources, who continue to be involved in the investigation, regarding targets of this investigation, two of whom are discussed herein. A description of, and background information about, the cooperating sources debriefed in connection with the information discussed herein are set forth below. The sources are referred to using male pronouns irrespective of the actual sex of the source.

10.      Unless otherwise stated, any information obtained from a cooperating source in this case has been related to your affiant by the source, by members of the Task Force and/or by other law enforcement officers who have debriefed the source. Moreover, unless otherwise stated, all source information set forth herein is based upon personal observations by the source and/or statements directed to or overheard by the source, from members of the drug trafficking organization (DTO) discussed herein, their criminal associates, or persons with personal knowledge of the incidents described below.

11.      **Cooperating Source Number One** (hereafter: "CS-6"): CS-6 is a confidential informant who has been monetarily compensated in exchange for information he provides to law enforcement. CS-6 has multiple prior felony convictions for criminal mischief in the first degree, larceny in the third degree, violation of a protective order, assault personnel, burglary in the second degree, sale of narcotics, criminal weapon possession, reckless burning, burglary in the

first degree, and assault in the second degree. CS-6 has multiple prior misdemeanor convictions

for breach of peace in the second degree, threatening in the second degree, assault in the third

degree, violation of probation, strangulation in the third degree, and interfering with police. The

information provided by CS-6 has been accurate and has been corroborated in part by

independent information obtained by investigators in the current investigation. To my

knowledge, CS-6 has not knowingly provided any false information. The information provided

by CS-6 has proven to be reliable and trustworthy. As a result, law enforcement has deemed the

information that CS-6 had provided regarding the DTO to be reliable.

        12.    **Cooperating Source Number Two** (hereafter "CS-7). CS-7 is a confidential

informant who has not been monetarily compensated for his/her cooperation, except for personal

expenses incurred through working with the FBI. CS-7 is cooperating with the FBI as part of a

cooperation agreement in a separate federal matter in the hopes of obtaining consideration for his

pending sentencing. CS-7 has multiple prior felony convictions for burglary in the third degree,

assault personnel, violation of protective order, and possession with intent to distribute narcotics.

CS-7 has multiple prior misdemeanor convictions for interfering/resisting, reckless

endangerment in the second degree, assault in the third degree, probation violation, burglary in

the third degree, assault in the third degree, possession of a controlled substance, larceny in the

sixth degree, and others. The information provided by CS-7 has been accurate and has been

corroborated in part by independent information obtained by investigators in the current

investigation. To my knowledge, CS-7 has not knowingly provided any false information. The

information provided by CS-7 has proven to be reliable and trustworthy. As a result, law

enforcement has deemed the information that CS-7 had provided regarding the DTO to be

reliable.

## TIII WIRETAP AUTHORIZATIONS

13.     On or about July 14, 2023, the Honorable U.S. District Judge Jeffrey Alker Meyer authorized the interception of wire and electronic communications occurring over phone number 203-504-0958 (hereafter, "TARGET TELEPHONE-1"), subscribed to Iralis Avila, at a particular address on Cossett Street, in Waterbury, Connecticut, and used by FIGUEROA. Interceptions over TARGET TELEPHONE-1 began on or about July 15, 2023, pursuant to the July 14, 2023-Order and ended on July 30, 2023, after FIGUEROA discontinued his use of TARGET TELEPHONE-1.

14.     On or about August 14, 2023, the Honorable U.S. District Judge Jeffrey Alker Meyer authorized the interception of wire and electronic communications occurring over phone number 203-948-1087 (hereafter, "TARGET TELEPHONE-2"), subscribed to Iralis Avila, at a particular address on Cossett Street, in Waterbury, Connecticut, and used by FIGUEROA. Interceptions over TARGET TELEPHONE-2 began on or about August 15, 2023, pursuant to the August 14, 2023-Order and continue at the time of this writing.

## PROBABLE CAUSE

*June 15, 2023, Controlled Purchase*

15.     On or about June 15, 2023, CS-6, at the direction of, and under the supervision of the FBI, purchased 75 pink plastic containers, each containing a white rock-like substance (suspected cocaine base) from FIGUEROA. Details pertaining to the controlled purchase and some, but not necessarily all the communications between CS-6 and FIGUEROA on June 15, 2023, is set forth below.

16.     On or about June 15, 2023, CS-6 met with investigators at a pre-arranged location to prepare for the anticipated purchase of illegal narcotics from FIGUEROA. An investigator

observed CS-6 call TARGET TELEPHONE-1. The initial call was unanswered. Soon after,

however, an investigator observed CS-6 call TARGET TELEPHONE-1 again. A male's voice,

who CS-6 recognized as "Coco" [FIGUEROA], answered. A review and translation of the

recording[3] revealed the following pertinent conversation:

> FIGUEROA: What's up dude?
> CS: Coco, I need a pack man. I need the pack.
> FIGUEROA: Okay, I will stop by then.

17.     CS-6 sent a text message to FIGUEROA, "Coco 375 esta vien". CS-6 did not

receive a response text. Prior to CS-6's meeting with FIGUEROA, investigators searched CS-6

for drugs, money, and weapons with negative results, and provided CS-6 with official FBI funds

and an audio/video recording device.

18.     CS-6 departed the meeting with agents. CS-6 was surveilled by investigators to

the area of the agreed upon transaction location. As CS-6 arrived at Maple Avenue, surveillance

units observed **Target Vehicle-1** pull onto Maple Avenue. Approximately four minutes later,

CS-6 was observed walking towards the predetermined meet location where investigators met

with CS-6 approximately three minutes later.

19.     At the predetermined meet location, CS-6 transferred custody of the suspected

cocaine base CS-6 had purchased using the government funds. CS-6 was again searched for

drugs, money, and weapons with negative results.

20.     According to CS-6[4], he met with Coco who was seated in the driver's seat of

**Target Vehicle-1**. CS-6 observed a firearm in the center of the of the vehicle between the seat

---

3 Unless otherwise indicated, all the conversations set forth herein were originally in Spanish and translated to
English by a native Spanish speaker. The transcripts are in draft form and subject to revision.
4 CS-6 was shown a photograph of FIGUEROA and identified him as "Coco."

and the arm rest. CS-6 also observed several "packs" of crack cocaine in the vehicle. CS-6 handed Coco the government funds in exchange for the crack cocaine.

21.     The suspected cocaine base CS-6 purchased using the government funds on June 15, 2023, had a gross weight (with packaging) of approximately 29.5 grams. A sample of the suspected cocaine base was field tested with positive results for the presumptive presence of cocaine base. I have reviewed the audio/video recording of the meeting between CS-6 and FIGUEROA, and it is consistent with surveillance observations and CS-6's report of the narcotics transaction.

*August 16, 2023, Controlled Purchase*

22.     On or about August 16, 2023, CS-7, at the direction of, and under the supervision of the FBI, purchased 225 plastic containers, each containing a white rock-like substance (suspected cocaine base) from FIGUEROA. Details pertaining to the controlled purchase and some, but not necessarily all the communications between CS-7 and FIGUEROA on August 16, 2023, are set forth below.

23.     On or about August 16, 2023, CS-7 met with investigators at a pre-arranged location to prepare for the anticipated purchase of illegal narcotics from FIGUEROA. Prior to CS-7's meeting with FIGUEROA, investigators searched CS-7's person and vehicle for drugs, money, and weapons with negative results, and provided CS-7 with official FBI funds and an audio/video recording device.

24.     CS-7 departed and was surveilled by investigators to the area of Maple Avenue. As CS-7 arrived at Maple Avenue, surveillance units observed **Target Vehicle-1** parked on the street. CS-7 was observed sitting down near **Target Vehicle-1**. Approximately 7 minutes later, CS-7 was observed driving away.

25.     At the predetermined meet location, CS-7 transferred custody of the suspected cocaine base CS-7 had purchased using the government funds. CS-7's person and vehicle were again searched for drugs, money, and weapons with negative results.

26.     According to CS-7, he met with Coco[5] on the street on Maple Avenue. They spoke briefly. CS-7 noted that he observed several hand-to-hand narcotics transactions between Coco and unknown persons while CS-7 was on Maple Avenue. CS-7 got into the passenger seat of **Target Vehicle-1** while Coco got into the driver's seat. CS-7 gave Coco the government funds and Coco gave CS-7 the suspected cocaine base.

27.     The suspected cocaine base CS-7 purchased using the government funds on August 16, 2023, had a gross weight (with packaging) of approximately 90 grams. A sample of the suspected cocaine base was field tested with positive results for the presumptive presence of cocaine base. I have reviewed the audio/video recording of the meeting between CS-7 and FIGUEROA, and it is consistent with surveillance observations and CS-7's report of the narcotics transaction.

28.     Investigators have also utilized law enforcement installed HSI pole cameras to conduct both live monitoring and reviewable surveillance of the Maple Avenue and Cherry Street area. The pole camera can be maneuvered, zoomed in and out, and is positioned on Maple Avenue and Cherry Street in Waterbury, Connecticut, which investigators believe is the main location in which illegal narcotics are distributed by members of the DTO. The pole camera has captured FIGUEROA and other members of the DTO conspiring and distributing narcotics to customers on a daily and nightly basis. Additionally, investigators have also utilized pole

---

5 CS-7 was shown a photograph of FIGUEROA and identified him as "Coco."

cameras to conduct both live monitoring and reviewable surveillance of a residence on Irion Street, Waterbury, Connecticut, where FIGUEROA is believed to stay at times.

29.     The investigation has revealed that the TARGET TELEPHONE-1 was a phone primarily used by FIGUEROA to arrange the distribution of illegal narcotics. Interceptions over TARGET TELEPHONE-1 evidence FIGUEROA's involvement in the distribution of cocaine base, and well as that he has conspired with other members of the DTO to sell narcotics.

30.     I believe that FIGUEROA coordinates the distribution of illegal narcotics with individuals associated with the DTO. For example, on July 16, 2023, a telephone call was intercepted between FIGUEROA, who was using the TARGET TELEPHONE-1, and Jose DELROSARIO-CANELA (DELROSARIO-CANELA) who was using telephone number 203-721-1323 (Session 132)[6]. During the conversation, DELROSARIO-CANELA stated, "It's only 60, damn I'm a have to sell them because tell me what else am I gonna do. Ok Boss I've bothered you enough." FIGUEROA responded, "It's weird because that gets counted 2 to 3 times." DELROSARIO-CANELA responded, "Yeah I don't count that." FIGUEROA stated, "One person, The weirdest thing is that the same person that gives them to me for everybody else and they all have profits how come yours don't?" Later in the conversation DELROSARIO-CANELA stated, "Yes, altogether there were two 60s thank goodness that I thought about it because you know I don't usually count them and just keep it going but I decided to call you so that you don't think anything about me, but no worries I'll keep selling them." I believe, based on my training and experience and information developed during the investigation, that "two 60s" was a reference two "packs" of "caps" of cocaine base which only held $60 of profit. As detailed

_____

[6] The transcriptions in this affidavit are based on a preliminary review of line sheets and the recordings, and are in draft form, subject to revision. The session numbers refer to the designation given to a particular wire or electronic communication.

above, on or about June 15, 2023, CS-6, at the direction of, and under the supervision of the FBI, purchased 75 pink plastic containers, each containing a white rock-like substance (suspected cocaine base) from FIGUEROA.

31.     On July 17, 2023, at approximately 4:18 p.m., a telephone call was intercepted between FIGUEROA, who was using the TARGET TELEPHONE-1, and DELROSARIO-CANELA, who was using telephone number 203-721-1323 (Session 189), During the conversation, FIGUEROA advised DELROSARIO-CANELA that he would see him [DELROSARIO-CANELA] in a minute. At approximately 4:30 p.m., investigators conducting pole camera surveillance in the area of Maple Avenue and Cherry Street observed a vehicle matching the physical description of **Target Vehicle-1** park on Maple Avenue. A male matching the physical description of Jose CAMACHO (CAMACHO) approached the vehicle and took something from the driver then hand it to a male matching the physical description of Manuel GENAO-ROMANO (GENAO-ROMANO). The image below is a screenshot from the pole camera footage of CAMACHO receiving an item from **Target Vehicle-1,** then handing an item to GENAO-ROMANO.



32.     Immediately after receiving an item from **Target Vehicle-1**, CAMACHO walked to a nearby driveway and appeared to conduct hand-to-hand narcotics transactions with individuals who appeared to be waiting in the area. The image below is a screen shot from the pole camera footage depicting CAMACHO appearing to engage in a hand-to-hand narcotics transaction. Based on my training and experience, I believe that the information gathered to date discussed herein reflects that **Target Vehicle-1** was used to transport narcotics for resale on July 17, 2023.



33.     On July 18, 2023, at approximately 7:01 p.m., a telephone call was intercepted between FIGUEROA, who was using the TARGET TELEPHONE-1, and an unidentified male, believed to be Moises VALENTIN (VALENTIN), who was using telephone number 475-295-0536 (Session 248).[7] During the conversation, the unknown male believed to be VALENTIN stated, "I'm going to call the kid, you can knock on the door." FIGUEROA responded, "Do you know which one they have?" VALENTIN responded, "I'm going to call him to see which one he had, and I'll call you back." I believe, based on my training and experience, that VALENTIN requested that FIGUEROA meet with an unidentified individual to pick up illegal narcotics.

---

7 Phone number 475-295-0536 is believed to be used by VALENTIN through open-source database checks. The subscriber information for the VALENTIN TELEPHONE is unknown.

34.     On July 19, 2023, at approximately 5:33 p.m., a telephone call was intercepted between FIGUEROA, who was using the TARGET TELEPHONE-1, and DELROSARIO-CANELA, who was using telephone number 203-721-1323 (Session 308), During the conversation, DELROSARIO-CANELA stated, "Tell me there is no more." FIGUEROA responded, "Ok, I am coming now." Approximately 25 minutes later, a telephone call was intercepted between FIGUEROA who was using the TARGET TELEPHONE-1, and DELROSARIO-CANELA, who was using telephone number 203-721-1323 (Session 314). During the conversation, FIGEUROA stated, "I am coming right now, and I am leaving." DELROSARIO-CANELA responded, "Yes, but Pito he is over there, went to take a walk. I told him to wait, and he did not want to." FIGUEROA asked, "What did you say?" DELROSARIO-CANELA responded, "He finished already, I asked him to give me the money, but he did not want to." I believe, based on my training and experience, that DELROSARIO-CANELA contacted FIGUEROA for a resupply of illegal narcotics, "Tell me there is no more." Also, I believe when DELROSARIO-CANELA stated, "I asked him to give me the money" it was a reference to DELROSARIO-CANELA collecting the proceeds from illegal narcotics transactions conducted by CAMACHO for FIGUEROA.

35.     On July 19, 2023, at approximately 6:52 p.m., investigators observed a vehicle matching the physical description of **Target Vehicle-1** park on Maple Avenue. A male matching DELROSARIO-CANELA's description walked up to the driver's window and reached inside the vehicle. Immediately after, DELROSARIO appeared to place an object in a nearby bush. I believe, based on my training and experience, that DELROSARIO-CANELA received illegal narcotics from FIGUEROA, operating **Target Vehicle-1**, and then placed the illegal narcotics in the bush. Approximately six minutes later, DELROSARIO-CANELA appeared to retrieve

something from the bush then conduct a hand-to-hand narcotics transaction with an unidentified male on Maple Street. The screenshot below from the pole camera depicts this hand-to-hand exchange.



36.     On July 24, 2023, investigators were monitoring the pole camera mounted on Cherry Street and Maple Avenue. While conducting this surveillance, they observed **Target Vehicle-3** parked in the area of Maple Avenue and Cherry Street. While observing the vehicle, FIGUEROA exited the driver's seat of the vehicle. FIGUEROA met with an unknown subject on the street. He appeared to engage in a hand-to-hand transaction soon after exiting **Target Vehicle-3** (pictured below).



37.     On August 20, 2023, investigators were monitoring the pole camera mounted on

Cherry Street and Maple Avenue. While conducting this surveillance, they observed **Target**

**Vehicle-3** parked on Maple Avenue FIGUEROA was seen going to and from the vehicle for

several hours. FIGUEROA could be seen washing and waxing the vehicle in the afternoon hours.

Multiple hand-to-hand transactions were observed between FIGUEROA and unknown subjects

throughout the day. On occasion, FIGUEROA would conduct these transactions from within

**Target Vehicle-3.** These events were captured and are shown below.



38.     Based on the investigation to date, we have also gathered information pertaining to DIAZ-RIVERA and his use of **Target Vehicle-4**. I believe, based on my training and experience and information learned during the investigation, that DIAZ-RIVERA is one of the DTO's sources of supply and a supervisor of the street-level dealers associated with the DTO. For example, on August 17, 2023, at approximately 9:50 p.m., a telephone call was intercepted between FIGUEROA, who was using the TARGET TELEPHONE-2, and Neysa VAZQUEZ

(VAZQUEZ), who was using telephone number 203-465-9223 (Session 527), During the conversation, FIGUEROA stated, "Listen, make sure that when you guys make the caps, the packages that will go to Domi, make sure that there is a [unintelligible] in each cap. VAZQUEZ asked, "What?" FIGUEROA responded, "Because he is fucking complaining about the caps all day long." VAZQUEZ responded, "He did not complain yesterday." FIGUEROA stated, "He's been complaining all day, saying that the caps are empty. The caps are empty." VAZQUEZ responded, "They are not empty. I was the one who made them. They are fine." FIGUEROA responded, "No, there are some small ones." VAZQUEZ responded, "Well, I fill them up to the top but, if it comes out to less, then Lupin better not fuck us because I try to do what he said that we have to do in order for them to come out. You get me?" I know, based on information learned during the investigation, that "Domi" is the street name for DELROSARIO-CANELA, and "Lupin" is the street name for DIAZ-RIVERA. I believe that VAZQUEZ and FIGUEORA talked about the quantity of crack cocaine in the caps provided to DELROSARIO-CANELA for distribution. Further, I believe that when VAZQUEZ referred to Lupin, it was a reference to DIAZ-RIVERA's potential disapproval if they did not make enough profit based on the quantity of caps being sold if they increased the quantity of crack cocaine in each cap.

39.     On August 18, 2023, surveillance units observed DIAZ-RIVERA operating a black Dodge pickup truck matching the description of **Target Vehicle 4** leaving the area of Maple Avenue. DIAZ-RIVERA stopped at a store on East Main Street, Waterbury, Connecticut, exited **Target Vehicle 4,** and entered the store. Soon after, DIAZ-RIVERA exited the store, reentered **Target Vehicle 4**, and drove to a **14-16 Waterville Street in Waterbury, Connecticut** (hereafter referred to as "**the particular address on Waterville Street**").

Surveillance units observed DIAZ-RIVERA walk up the back steps of **the particular address on Waterville Street** in Waterbury, Connecticut, to a third-floor residence.

40.     On August 18, 2023, investigators were monitoring the pole camera mounted on Cherry Street and Maple Avenue. While conducting this surveillance, they observed a vehicle matching the description of **Target Vehicle 4** park in front of a particular address on Maple Avenue.[8] Soon after, **Target Vehicle 4** parked, DELROSARIO-CANELA was observed engaging in what appeared to be a hand-to-hand transaction next to **Target Vehicle-4** (pictured below).



41.     DELROSARIO-CANELA knocked on the window of **Target Vehicle 4**. DIAZ-RIVERA exited **Target Vehicle 4**, left the door open, and walked away from the vehicle (pictured below). DELROSARIO-CANELA walked across the street and retrieved a bag then returned to **Target Vehicle 4** (pictured below).

---

8 8 It is noted that the positioning of the pole camera in the area of Maple Avenue, a one-way street, captures the front of vehicles as they drive towards the camera in most instances. **Target Vehicle 4** does not bear a license plate on the front of the vehicle.



42.     DELROSARIO-CANELA appeared to retrieve something from **Target Vehicle 4.** He then closed the door of **Target Vehicle 4**, walked across the street, and hung the backpack on the fence. I believe, based on my training and experience, that DELROSARIO-CANELA retrieved a resupply of illegal narcotics from **Target Vehicle 4**. Further, I believe that DELROSARIO-CANELA placed the illegal narcotics in the area in which he was selling to customers. Based on the investigation, it has been learned by investigators that members of the DTO will often hide illegal narcotics in the area they are selling for easy access but also to avoid being arrested with a larger quantity of illegal narcotics on their person if confronted by law enforcement.

43.     On August 21, 2023, investigators were monitoring the pole camera mounted on Cherry Street and Maple Avenue. While conducting this surveillance, they observed a vehicle matching **Target Vehicle 4's description** park in front of a particular address on Maple Avenue. DIAZ-RIVERA exited the vehicle and handed FIGUEROA a bag. FIGUEROA then placed the bag into **Target Vehicle 3**. Approximately two minutes later, FIGUEROA departed the area in **Target Vehicle 3**. Approximately three minutes later, investigators were monitoring the pole camera mounted on Irion Street and observed **Target Vehicle 3** park in front of a particular address on Irion Street. An unidentified female exited the residence, retrieved a bag from the driver's window, and reentered the residence. **Target Vehicle 3** departed the area and arrived back to the area of Maple Avenue approximately two minutes later. FIGUEROA was observed

exiting **Target Vehicle 3** soon after it arrived. I believe, based on my training and experience, that DIAZ-RIVERA transported illegal narcotics in **Target Vehicle 4** then provided them to FIGUEROA. FIGUEROA then transported the illegal narcotics to a particular address Irion Street where they were subsequently stored. I believe, based on information developed during the investigation, that illegal narcotics are processed and stored at a particular address on Irion Street.

44.     On August 18, 2023, at approximately 10:24 p.m., a telephone call was intercepted between FIGUEROA, who was using the TARGET TELEPHONE-2, and VAZQUEZ, who was using telephone number 203-465-9223 (Session 588). During the conversation, FIGUEROA stated, "Honey, can you try to make one really quick?" VAZQUEZ asked, "How many?" FIGUEROA responded, "One, but it has to be quickly." VAZQUEZ asked, "Why?" FIGUEROA responded, "Because people are coming, and he wants to leave one here." VAZQUEZ responded, "Come then, because I, I forgot, and I touched it and I have the drug test and I don't know what to take to clean up." FIGUEROA responded, "But it's just this job, make one honey."

45.     Approximately ten minutes later, FIGUEROA, who was using the TARGET TELEPHONE-2 received a telephone call from VAZQUEZ, who was using telephone number 203-465-9223 (Session 590). During the conversation, VAZQUEZ stated, "Come get it." FIGUEROA responded, "Alright, I'll head over there now." Approximately six minutes later, investigators were monitoring the pole camera mounted on Irion Street and observed a vehicle matching the description of **Target Vehicle 1** park in front of a particular address on Irion Street. An unidentified individual exited the residence and meet at the driver's window of **Target Vehicle 1**. **Target Vehicle 1** then departed the area and arrived back to Maple Avenue

approximately two minutes later. **Target Vehicle 1** pulled into the driveway of a particular address on Maple Avenue. An individual matching DIAZ-RIVERA's physical description walked towards the driver's side of **Target Vehicle 1** and then out of view of pole camera footage. Soon after, DIAZ-RIVERA walked towards the intersection of Maple Avenue and Cherry Street where he appeared to engage in a hand-to-hand transaction with an unidentified individual.

46.     On August 22, 2023, surveillance units observed DIAZ-RIVERA **Target Vehicle 4** leaving the area of Maple Avenue. Surveillance units followed **Target Vehicle 4** and observed it pull into the driveway of **the particular address on Waterville Street** in Waterbury, Connecticut. Investigators have, on several occasions, observed **Target Vehicle 4** parked at **the particular address** at various time during the day and night.

47.     Given the information set forth above, there is probable cause to believe, and I do believe that the locations of the **Target Vehicles** constitute evidence of those criminal violations, and provide evidence of criminal activities, including leading to the identification of other individuals who are engaged in the commission of the offenses and identifying locations where DIAZ-RIVERA, FIGUEROA, and others are engaging in criminal activity.

48.     To track the movements of the **Target Vehicles** effectively, and to decrease the chance of detection, I seek to place a tracking device in or on the **Target Vehicles** while it is in the District of Connecticut. The information obtained from the GPS device will facilitate physical surveillance of the **Target Vehicles** as well as their operators and occupants, and it will constitute or lead to evidence of the Target Offenses because it will assist investigators in ascertaining, *inter alia*, the locations where DIAZ-RIVERA, FIGUEROA, and/or their associates obtain narcotics, store narcotics, sell narcotics and store proceeds from the sales of narcotics.

49.     To ensure the safety of the executing officers and to avoid premature disclosure of the investigation, it is requested that the Court authorize installation and removal of the tracking device during both daytime and nighttime hours. Given the evidence that DIAZ-RIVERA, FIGUEROA, and their associates are involved in distributing narcotics, investigators will seek times and places to affect the installation, repair, replacement, and removal of the tracking device that will best ensure the safety of investigators and best ensure the integrity and secrecy of this investigation.

50.     I also request authorization to enter private property to execute the search warrant for Target Vehicle-4, specifically, **the particular address on Waterville Street** in Waterbury, Connecticut.

51.     In the event the Court grants this application, there will be periodic monitoring of the tracking devices during both daytime and nighttime hours for a period of 45 days following installation of the device. The tracking device may produce signals from inside private garages or other such locations which are not open to the public or visual surveillance.

52.     It is requested that the warrant and accompanying affidavit and application in support thereof, as they reveal an ongoing investigation, be sealed until further order of the Court to avoid premature disclosure of the investigation, and better ensure the safety of agents and others.

53.     For the forgoing reasons, I respectfully request that the Court issue a warrant authorizing members of HSI and the FBI or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above described investigation, to install tracking devices in or on the **Target Vehicles** within the District of Connecticut, within 10 calendar days of issuance of the requested warrant; to remove said

tracking device from the **Target Vehicles** after the use of the tracking device has ended; to surreptitiously enter the **Target Vehicles** and/or move the **Target Vehicles** to effect the installation, repair, replacement and removal of the tracking device; and to monitor the tracking device, for a period of 45 days. I also request that the Order authorizes that Special Agents of HSI as well as Special Agents/Task Force Officers of the FBI, or their authorized representatives not be required to leave a copy of the Court's Order in any vehicles entered, due to the covert nature of the installations and investigation.

54.     To track the locations of the **Target Vehicles** at all times, it will be necessary to monitor the tracking device continuously, which may include monitoring signals produced from inside enclosed garages or other locations neither open to the public nor accessible to visual surveillance, and signals produced from outside the District of Connecticut.

55.     Based upon the foregoing, I submit that there is probable cause to believe that use of GPS mobile tracking devices on the **Target Vehicles** will lead to the discovery of the items set forth in Attachment B, which constitute evidence, fruits, and/or instrumentalities of the Target Offenses.

## AUTHORIZATION REQUEST

56.     Based upon the foregoing, I request that the Court issue warrants authorizing law enforcement officers to: (1) initiate signaling to and from the tracking devices in order to monitor the **Target Vehicles** at any time of day or night within ten (10) days from the date of this warrant; (2) enter onto private property for the limited purpose of maintaining, repairing, or removing the tracking device at any time of day or night; (3) move the **Target Vehicles** to a concealed area for the limited purpose of maintaining, repairing, or removing the tracking device at any time of day or night; and (4) maintain, use, monitor, and record the signals and

information from the tracking device at any time of day or night, for a period of forty-five (45) days from the issuance of the warrant, including signals produced from inside private garages and other locations not open to the public or visual surveillance, and signals produced in the event that any or all of the **Target Vehicles** leaves the District of Connecticut but remains within the United States.

57.     In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I request that the warrant delay notification of the execution of the warrant for a period of 30 days after the end of the authorized period of because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the investigation. The investigation is not known to the targets of the investigation. Providing immediate notification of the execution of the warrant may have an adverse result, as defined in 18 U.S.C. § 3103a(b). Providing immediate notice would seriously jeopardize the ongoing investigation, by alerting DIAZ-RIVERA and FIGUEROA to the federal interest in their locations and illegal activities and potential cause them to alert their coconspirators to the investigation. Such a disclosure would give DIAZ-RIVERA, FIGUEROA, or their coconspirators an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). Thus, I request that the Court authorize the delayed notification of the execution of this warrant.

58.     As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorized the seizure of location information (as defined in 18 U.S.C. § 2510), there is reasonable necessity for the seizure for the reasons set forth above. *See* U.S.C. § 3103a(b)(2).

59.     I further request that the Court issue an Order pursuant to which the application of the United States and all papers submitted in support of the application be filed under seal. Disclosure of this information would compromise this ongoing investigation.


Respectfully submitted,

KYLE C
BOWDY

Digitally signed by KYLE
C BOWDY
Date: 2023.08.30
09:39:38 -04'00'

Special Agent Kyle C. Bowdy
Homeland Security Investigations


The foregoing affidavit has been attested to me by HSI Special Agent Kyle C. Bowdy over the telephone on this __30th__ day of August 2023.


Maria E.
Garcia

Digitally signed by Maria
E. Garcia
Date: 2023.08.30
13:36:08 -04'00'

HONORABLE MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

Descriptions pertaining to **Target Vehicle-1**, **Target Vehicle-3,** and **Target Vehicle-4** (collectively referred to herein and in Attachment B as the "**Target Vehicles**") are set forth below.

**Target Vehicle-1** is a Gold Ford Explorer bearing Connecticut registration AW42925 which is not registered to any person or this vehicle. **Target Vehicle-1** is known to be operated by Tommy Figueroa in the District of Connecticut. A screenshot of **Target Vehicle-1** from the pole camera footage is set forth below.



**Target Vehicle-3** is a black 2008 Honda Civic bearing Connecticut license plate AX91675 which is registered to Silvia Torres. **Target Vehicle-3** is known to be operated by Tommy Figueroa in the District of Connecticut. A screenshot of **Target Vehicle-3** from the pole camera footage is set forth below.



**Target Vehicle-4** is a black Dodge pickup truck bearing Connecticut license plate BC27455 which is not registered to this vehicle. **Target Vehicle-4** is known to be operated by Daniel Diaz-Rivera in the District of Connecticut. A screenshot of **Target Vehicle-4** from the pole camera footage is set forth below.



**ATTACHMENT B**

The warrant authorizes law enforcement to initiate a signal to and from a Global Positioning System (GPS) mobile tracking device on each of the **Target Vehicles** described in Attachment A (and allowing for any maintenance and repair of the mobile tracking device) in order to monitor and record signals and information obtained and produced by each GPS mobile tracking device, for a period of 45 days, during all times of day and night, for the purpose of obtaining evidence of violations of federal law, including violations of Title 21, United States Code, Sections 841, 846, and 843(b) (Target Offenses), by Tommy FIGUEROA, a.k.a. "Coco," Daniel DIAZ-RIVERA, a.k.a. "Lupito," a.k.a. "Lupin, " and others, known and unknown, including information concerning the locations of the **Target Vehicles**, and including when such signals and information are produced when any or all of the **Target Vehicles** is indoors or in areas where there may be a reasonable expectation of privacy, in the District of Connecticut and outside of the District of Connecticut but within the United States. Information about the locations of the **Target Vehicles** includes all available GPS data, latitude-longitude data, and other precise location information, as well as all data about which "towers" (*i.e.*, antenna towers covering specific geographic areas) and "sectors" (*i.e.*, faces of the towers) received a radio signal; from the GPS tracking device on the **Target Vehicles** described in Attachment A. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

Law enforcement is also authorized to enter private property located at **14-16 Waterville Street in Waterbury, Connecticut**, for the limited purpose of executing the search warrant for **Target Vehicle-4**.